# In the United States Court of Federal Claims

No. 15-808C
(Filed Under Seal: May 5, 2016)
(Reissued for Publication: May 20, 2016)<sup>*</sup>

*************************************

| | |
|---|---|
| DELLEW CORPORATION, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant, | * |
| | * |
| and | * |
| | * |
| TECH SYSTEMS, Inc., | * |
| | * |
| Defendant-Intervenor. | * |

Attorneys' Fees; Equal Access to Justice
Act; Prevailing Party; <u>Buckhannon</u>

*************************************

<u>Adam K. Lasky</u>, Seattle, WA, for plaintiff.

<u>Erin K. Murdock-Park</u>, United States Department of Justice, Washington, DC, for defendant.

<u>Eric Crusius</u>, Tysons Corner, VA, for defendant-intervenor.

## <u>OPINION AND ORDER</u>

**SWEENEY**, Judge

Before the court is plaintiff's motion, made in accordance with Rule 54 of the Rules of the United States Court of Federal Claims ("RCFC"),[1] for attorney's fees and costs pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412 (2012).

---

<sup>*</sup> This reissued Opinion and Order incorporates the agreed-to redactions proposed by the parties on May 16, 2016.  The redactions are indicated with bracketed ellipses ("[. . .]").

[1] RCFC 54(d) governs the award of attorney's fees and costs in the United States Court of Federal Claims ("Court of Federal Claims").

## I. BACKGROUND

On July 30, 2015, plaintiff Dellew Corporation ("Dellew") filed a postaward bid protest challenging a contract award to Tech Systems, Inc. ("TSI") under a solicitation issued by the United States Army Contracting Command ("Army") in Rock Island, Illinois. Dellew Corp. v. United States, 124 Fed. Cl. 429, 430 (2015). The purpose of the solicitation was to acquire logistics support services at Schofield Barracks, Hawaii. Id. According to Dellew, the Army erred by (1) awarding the contract to TSI because TSI refused to cap its proposed general and administrative ("G&A") rate, Compl. ¶¶ 64-72; (2) awarding the contract to TSI because the contract awarded was not based upon the proposal originally submitted by TSI, id. ¶¶ 73-77; and (3) failing to perform an adequate cost realism analysis, which was required because the solicitation called for the award of a cost reimbursement contract, id. ¶¶ 78-85.

On October 22, 2015, the court heard oral argument on the parties' cross-motions for judgment on the administrative record, during which the court commented on the merits of the parties' respective arguments. At the close of argument, counsel for defendant indicated that the Army might take corrective action and requested time to discuss the issue with the agency. Less than one month later, on November 12, 2015, defendant filed a notice with the court indicating that the agency would be taking corrective action. Id. Defendant subsequently moved to dismiss the case for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1). Id. In a decision issued on December 11, 2015, the court granted defendant's motion and dismissed plaintiff's complaint as moot. Id. at 432. Therefore, the only remaining issue is plaintiff's motion for attorney's fees and costs.

## II. DISCUSSION

### A. Legal Standard

"In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247 (1975). Under this so-called "American Rule," fees are not awarded to prevailing parties "absent explicit statutory authority." Key Tronic Corp. v. United States, 511 U.S. 809, 819 (1994). The EAJA provides such authority:

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1); see also id. § 2412(a) (providing for the reimbursement of costs). In order for a party to be successful with its EAJA motion, five conditions must be met:

> (1) the fee application must be submitted within 30 days of final judgment in the action and be supported by an itemized statement; (2) at the time the civil action was initiated, the applicant, if a corporation, must not have been valued at more than $7,000,000 in net worth or employed more than 500 employees; (3) the applicant must have been the "prevailing party" in a civil action brought by or against the United States; (4) the Government's position must not have been "substantially justified;" and (5) there cannot exist any special circumstances that would make an award unjust.

WHR Grp., Inc. v. United States, 121 Fed. Cl. 673, 676 (2015) (citing 28 U.S.C. § 2412(d)(1)(A)-(B)).

The term "prevailing party" is not defined in the EAJA. In Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources, 532 U.S. 598 (2001), the United States Supreme Court ("Supreme Court") held that the term "prevailing party," as used in the Fair Housing Amendments Act ("FHAA") and the Americans with Disabilities Act ("ADA"), refers to one who obtains a "material alteration of the legal relationship of the parties." Id. at 603-04. Rejecting the catalyst theory, wherein a prevailing party is one whose lawsuit causes defendant to voluntarily change its conduct, the Supreme Court held that the change in the parties' legal relationship must have a certain "judicial imprimatur," such as a judgment on the merits or the entry of a consent decree. Id. at 604-05.

Following the Buckhannon decision, the United States Court of Appeals for the Federal Circuit ("Federal Circuit") extended the Supreme Court's rejection of the catalyst theory to cases brought pursuant to the EAJA. See Brickwood Contractors, Inc. v. United States, 288 F.3d 1371, 1379 (Fed. Cir. 2002) ("In sum, we reject the Court of Federal Claims' analysis that the text or the legislative history of the EAJA compels a reading or construction of the term 'prevailing party' different from other federal fee-shifting statutes and thus conclude that the Supreme Court's construction of that term as not allowing for the 'catalyst theory' applies with equal force and effect to the EAJA."). In addition, the Federal Circuit further allowed that the Buckhannon "threshold can also be met by other court action 'equivalent' to a judgment on the merits or a court-ordered consent decree" as long as "it carries a sufficient judicial imprimatur to materially change the legal relationship of the parties." Rice Servs., Ltd. v. United States, 405 F.3d. 1017, 1026 (Fed. Cir. 2005) (citations omitted); see, e.g., Former Employees of Motorola Ceramic Prods. v. United States, 336 F.3d 1360, 1366 (Fed. Cir. 2003) ("[W]here the plaintiff secures a remand requiring further agency proceedings because of alleged error by the agency, the plaintiff qualifies as a prevailing party (1) without regard to the outcome of the agency proceedings where there has been no retention of jurisdiction by the court, or (2) when successful in the remand proceedings where there has been a retention of jurisdiction."). In other words, courts need not "focus only on the formalistic identification of the party in whose favor judgment was entered, but instead [must] include within the category of 'prevailing party' applicants that prevail on an issue or issues and achieve some of the benefits sought by the litigation." Precision Pine & Timber, Inc. v. United States, 83 Fed. Cl. 544, 548 (2008).

**B. Plaintiff's Application Was Timely Filed and Supported by an Itemized Statement**

As noted above, under the EAJA, a fee application must be submitted within thirty days of final judgment. 28 U.S.C. § 2412(d)(1)(B). Final judgment is "a judgment that is final and not appealable." Id. § 2412(d)(2)(G); see also Melkonyan v. Sullivan, 501 U.S. 89, 96 (1991) (holding that under the EAJA, a judgment is no longer appealable once the time for filing an appeal has lapsed). Pursuant to the Federal Rules of Appellate Procedure ("FRAP"), if one of the parties is the United States, "[t]he notice of appeal may be filed by any party within 60 days after entry of the judgment or order appealed from." FRAP 4(a)(1)(B)(i). Thus, in this case, plaintiff had ninety days from December 17, 2015, the date judgment was entered, to file its motion. Because the motion was filed on January 16, 2016, well within the ninety-day period, it is timely. Defendant agrees. Def.'s Resp. 6. In addition, plaintiff attached an itemized statement of its attorney's fees and expenses to its application. See Pl.'s Mot. Attach. 3.

**C. When the Action Was Commenced, Plaintiff Was Valued at Less Than $7 Million and Employed Fewer Than Five Hundred Employees**

The court finds that plaintiff meets the net worth and size standards set forth in the statute.[2] See 28 U.S.C. § 2412(d)(2)(B). Through the declaration of Kara Chandra, plaintiff's corporate accountant, plaintiff established that its audited net worth was $[. . .] for calendar year 2013, and $[. . .] for calendar year 2014. Pl.'s Mot. 12. Plaintiff also established through Ms. Chandra's declaration that its unaudited net worth as of July 31, 2015, one day after this action was commenced, was $[. . .]. Id. Thus, plaintiff's net worth was less than $7,000,000 when the suit was filed. In addition, through the declaration of Kelsey Lewis, plaintiff's president, plaintiff established that from July 1, 2015, to July 31, 2015, it employed fewer than one hundred employees. Pl.'s Mot. 12. Thus, plaintiff employed fewer than five hundred employees on July 30, 2015, the date this action was initiated. Defendant concedes that plaintiff has met this second requirement. Def.'s Resp. 6.

**D. Plaintiff Is a Prevailing Party**

In this case, the issue with regard to plaintiff's status as a prevailing party is whether the court's oral comments—made during the October 22, 2015 argument on the parties' cross-motions for judgment on the administrative record—carried a sufficient judicial imprimatur to materially alter the relationship between plaintiff and defendant such that plaintiff qualifies as a prevailing party under the EAJA. Upon review of the admittedly scant case law on point, the court concludes that the answer is yes.

In Brickwood Contractors, Inc., the United States Department of the Navy ("Navy") issued an invitation for bids ("IFB") on February 9, 1999, for elevated water storage tank repair services. 288 F.3d at 1373. It then amended the IFB to add contamination testing and removal services. Id. On May 5, 1999, after receiving five bids, including one from Brickwood

---

[2] "Net worth, for purposes of the EAJA, is calculated by subtracting total liabilities from total assets." Scherr Constr. Co. v. United States, 26 Cl. Ct. 248, 251 (1992) (citing City of Brunswick v. United States, 849 F.2d 501, 503 (11th Cir. 1988)).

Contractors, Inc. ("Brickwood"), the Navy announced that there was no evidence of contamination and that therefore the additional services were not needed.  Id.  Prior to that announcement, Brickwood's bid was the lowest.  Id.  After the contamination testing and removal services were eliminated, however, that was no longer the case.  Id.

On June 15, 1999, the Navy converted its amended IFB to a request for proposals ("RFP"), a negotiated procurement.  Id.  The contamination testing and removal services were not included.  Id.  On June 18, 1999, Brickwood filed a bid protest case seeking to enjoin the Navy from converting the IFB to an RFP and to instead award Brickwood the contract.  Id.  Three days later, the Court of Federal Claims held a hearing on Brickwood's motion for a temporary restraining order ("TRO").  Id.  On July 16, 1999, before an opinion had been issued, the government filed a motion to dismiss the case, stating:  "After further consideration of both the circumstances surrounding the solicitation and the governing [Federal Acquisition Regulation ("FAR")] provisions, and in light of the Court's comments at the TRO hearing, the Navy has cancelled the solicitation and plans to re-solicit using a new IFB."  Id. at 1373-74.  On July 22, 1999, the court dismissed the protest without reaching its merits.  Id. at 1374.

Ruling on Brickwood's subsequent motion for attorney's fees under the EAJA, the court held that under the catalyst theory, Brickwood had satisfied the statute's prevailing party requirement.  Id.  Shortly after the court issued its judgment and awarded attorney's fees and expenses, the Supreme Court issued its ruling in Buckhannon rejecting the catalyst theory.  Id.  After the decision in Buckhannon was issued, the government filed a motion for relief from the court's previous ruling pursuant to RCFC 60(b).  Id. at 1374-75.  The court denied the government's motion on three alternative grounds:  (1) the Buckhannon court's definition of prevailing party applies to cases brought under the FHAA and the ADA but not to cases brought under the EAJA; (2) even if Buckhannon applies to the EAJA, in Buckhannon the desired change was brought about by the legislature whereas in Brickwood, the desired change was brought about by plaintiff and the court; and (3) even if Buckhannon applies to the EAJA, the court's statements during the TRO hearing constituted a sufficient judicial imprimatur to effect a material change in the legal relationship of the parties.  Id. at 1375.  On appeal, the Federal Circuit reversed the court's decision on all three grounds.  With respect to the comments made by the judge during the TRO hearing—the issue relevant to the instant case—the Federal Circuit held that they were insufficient to meet the requirements of Buckhannon:

> [The Court of Federal Claims] referenced remarks it made at the TRO hearing at some length and concluded that "[i]n this exchange, the court, although it did not issue a written opinion, announced its acknowledgment of the merits of plaintiff's claim, the rectitude of plaintiff's position, and the error of defendant's actions."  Id. at 748.

> We disagree.  As a preliminary matter, we note that the excerpt from the TRO hearing cited by the court is preceded by the following comment:  "So, obviously, this is a bare-bones record and those are very conclusory and very preliminary thoughts, but it should be enough for you to work from, from this point forward."

> The court proceeded to set a schedule for further proceedings in this case. In any event, the Court of Federal Claims' conclusions regarding remarks at a TRO hearing miss the mark. In our view, the cited comments are clearly not sufficient to establish a judicial imprimatur and they do not constitute a "court-ordered change in the legal relationship" of the parties as <u>Buckhannon</u> requires. All we have in this case are simply "very preliminary" remarks at a TRO hearing and no TRO ever issued.

<u>Id.</u> at 1380.

Three years later, the Federal Circuit issued <u>Rice Services, Ltd.</u> In that case, Rice Services, Ltd. ("Rice") filed a bid protest following the Navy's award of a contract for wardroom dining services to a competitor. <u>Rice Servs., Ltd.</u>, 405 F.3d. at 1018. In its May 9, 2002 complaint, Rice sought: (1) a declaration that the award was unlawful, (2) an order directing a new contract award, (3) an order prohibiting any extension of the contract beyond the base term, and (4) an order precluding any new award to the company that won the original bid. <u>Id.</u> at 1019. Following the filing of cross-motions for summary judgment, the government moved to dismiss the protest on the ground that the Navy unilaterally and voluntarily decided "to conduct a new contract solicitation." <u>Id.</u> On July 18, 2002, the Navy notified the original offerors that it had decided to reopen the competition. <u>Id.</u> It subsequently indicated that it would make a new award by November 20, 2002. <u>Id.</u> Further, the Navy indicated that it would not exercise the option under the original awarded contract. <u>Id.</u>

On September 26, 2002, the Court of Federal Claims granted the government's motion to dismiss and denied all other pending motions because the case had become "essentially moot" in that the relief Rice requested had been substantially afforded. <u>Id.</u> Rice then filed a motion for attorney's fees under the EAJA, which the court granted. <u>Id.</u> at 1020. The court reasoned: "The circumstances presented in this matter are equivalent to the situation where the parties consent to a remand order for agency corrective action and where the court does not retain jurisdiction while the further agency action is undertaken." <u>Id.</u> The court then denied the government's motion for reconsideration, holding that in order to qualify as a prevailing party under the EAJA, a party need only have obtained a court order with sufficient judicial imprimatur to materially alter the parties' legal relationship—requirements that were satisfied by the court's dismissal order because (1) the order required the Navy to comply with its promise to take curative action, a promise that "created independent rights and obligations," (2) Rice obtained "some relief on the merits" in that a new evaluation was promised and the Navy was enjoined from exercising its option under the original contract, and (3) the order was equivalent to a remand, thus qualifying as a "success on the merits." <u>Id.</u> at 1021. The government appealed the court's ruling and the Federal Circuit reversed. <u>Id.</u> at 1026-28.

As stated by the Federal Circuit, the issue before it was "whether the Dismissal Order of the Court of Federal Claims conferred prevailing party status upon Rice." <u>Id.</u> at 1026. Concluding that the order was neither an "enforceable judgment on the merits because the court did not reach the merits," nor "a court-ordered consent decree, as there is no evidence the order embodies an agreement between the parties," the Federal Circuit was left to consider whether the

order was the equivalent of a judgment or a consent decree in that it "carried sufficient judicial imprimatur to materially alter the legal relationship between Rice and the Navy." Id. The Federal Circuit found that it did not carry such judicial imprimatur and that Rice was attempting to proceed under the very catalyst theory rejected by the Supreme Court in Buckhannon:

> First, the facts before us show that the Navy acted unilaterally in initiating a reevaluation of bids. Indeed, the record contains no evidence of any discussions between the parties prior to the Navy initiating the reevaluation. Second, the record also indicates the Navy acted voluntarily, i.e. the Navy undertook remedial action before any rulings by the Court of Federal Claims. Moreover, it appears that all of the offerors, including Rice, responded favorably to the Navy's proposed remedial action before any rulings were made by the Court of Federal Claims. Third, once the government informed the court of the remedial action underway, the court issued the September 26, 2002 order dismissing the case without reaching the merits.

Id. at 1027. As a result, the Federal Circuit concluded that the order did not alter the parties' relationship, or that if it did, such alteration was not material. Id. Significantly, it also distinguished Brickwood:

> In addition, the facts here present less of a case for attorney's fees than those in Brickwood, because in Brickwood, the government only took remedial action after the court made preliminary comments from the bench regarding its view on the merits, comments that were adverse to the government.

Id. at 1027-28.

One year later, the Court of Federal Claims issued a decision that gave the term prevailing party its most expansive interpretation to date. In Universal Fidelity LP v. United States, 70 Fed. Cl. 310 (2006), Universal Fidelity LP ("Universal") filed a bid protest alleging that a solicitation for debt collection services issued by the Internal Revenue Service ("IRS") was "arbitrary, capricious, an abuse of discretion, and not in accordance with applicable procurement law." Id. at 311. On June 9, 2005, two days after the complaint was filed, the court held a status conference, during which the court and the parties agreed that the court would issue its decision on the merits without oral argument. Id.

Just over six weeks later, on July 25, 2005—after the merits of the case were fully briefed—the court issued an order to "alert the Agency that [the court] intend[ed] to enjoin th[e] solicitation, and to afford it an opportunity to make alternative plans and to take appropriate actions in a prompt and efficient manner." Id. The order also stated:

> [E]xcluding vendors on the Schedule that do not have current task orders irrespective of their experience or ability is arbitrary and

> capricious in the circumstances presented . . . . The Agency may
> accomplish the same ends more fairly and efficiently by other
> means, including other mandatory minimum requirements.
> Limiting the Solicitation to vendors currently performing debt
> collection services does not necessarily give the Agency the best
> opportunity to achieve its stated goals.

Id. at 311-12.  Following its receipt of the court's order, the government filed a status report indicating that, based on the court's order, the IRS intended to take corrective action by reissuing the solicitation without the mandatory requirement.  Id.  The government also asked the court to dismiss the case as moot.  Id.  The court did not dismiss the case, but instead issued another order, stating that "removing the mandatory requirement w[ould] extend the list of qualified bidders to include plaintiff."  Id.

After the IRS cancelled the solicitation at issue, the government moved to dismiss the case for lack of subject matter jurisdiction.  Id.  The court directed the clerk to dismiss the complaint because it "ha[d] no reason to be concerned at th[at] time that the new solicitation . . . [would] present concerns similar to those that prompted plaintiff's petition."  Id.  Universal's complaint was then dismissed without prejudice to its filing "new pleadings as necessary."  Id.  At this point, Universal filed a motion for attorney's fees under the EAJA.  Id.

In concluding that its July 25, 2005 order carried sufficient judicial imprimatur to materially alter the legal relationship between the parties because Universal had obtained the equivalent of a judgment on the merits or a consent decree and was therefore a prevailing party under the EAJA, the court emphasized that (1) it had advised the parties by written order that the solicitation would be enjoined, (2) the matter had been fully briefed, (3) the parties had agreed that no hearing was necessary, (4) its conclusions exhibited an essence of finality and were made late in the process," (5) it stated a legal conclusion when it wrote that the IRS's actions were arbitrary and capricious, (6) it "had performed the requisite analysis," and (7) it was in the process of finalizing a written opinion, which it would have issued had the IRS not taken corrective action.  Id. at 314-16.  Lastly, the court noted a public policy rationale for its decision:

> We feel strongly that to deny Universal attorney's fees under the
> circumstances presented would impart to the defendant an
> undeserved advantage in bid protest litigation.  Such a ruling
> would allow the Government to issue a solicitation that it knows
> may be subject to legal challenge, deny an agency-level protest,
> await litigation in the Court of Federal Claims, allow plaintiff to
> incur substantial costs in arguing its position, and then, at the
> eleventh-hour cancel the offending solicitation to avoid having to
> pay plaintiff's expenses arising out of a lawsuit designed to bring
> the Government's actionable conduct to the court's attention.  In
> short, such a scenario depicts the facts of our case.

Id. at 316.

In the case at bar, the court did not issue a written opinion on the merits.  Nor did the court issue a consent decree based on an agreement between the parties.  The court did, however, make numerous substantive comments during oral argument regarding the merits of the case and how it intended to rule—comments that effected a sufficient judicial imprimatur to materially alter the relationship between Dellew and the Army.

First, the court clearly stated its view that there was no meeting of the minds as to one of the contract's materials terms—the cap on the G&A rate TSI would charge the Army—and that it therefore intended to rule in Dellew's favor with respect to this issue:

> [T]he issue is unequal discussions.  I believe there was an ambiguity because the government thought it understood what TSI was offering.  I think TSI was unclear in its response, it kept saying the same thing—it kept giving the same response with regard to capping on three different occasions, and then when presented with the contract, it questioned . . . the rate that would be the G&A cap.

> It's a material term of the solicitation.  I don't think that eliminates TSI from the competitive range, but I think there's an ambiguity.  I don't think you're able to bump your competitor out, but I think this procurement should be returned to the agency for full and open discussions and then a proper evaluation and award.

> * * *

> [T]here is a signed contract where it's capped at [. . .] percent . . . . [W]here the analysis falls in Dellew's favor is that once presented with the contract that states a cap of [. . .] percent, TSI balks, which undercuts its argument that it was agreeing to a [. . .] percent cap.

> * * *

> [I]f there was a clear number that had been provided by TSI, it would not have said "approximately." . . .  [T]here had to be one number that was agreed upon, and again, to me what's critical is once TSI is told it's awarded the contract, and [. . .][, on behalf of TSI,] expresses delight with the award of the contract to Mr. Bennett, [a procurement contract officer with the Army], he still is hedging his bet with regard to the G&A cap rate, because he said . . . "I have a question with regard to [this issue]" . . . .  [H]e is not agreeing to a cap. . . .  [T]hat's the issue that this case turns on.

> * * *

It seemed to me that throughout the procurement process, TSI was hedging its bets in dealing with the Army[.  I]nstead of having a simple declarative sentence—"yes, we're capping," [or] "no, we're not capping, because we don't think it applies to us,"—there would have been more of an exchange between TSI and the Army[.  B]ut instead of having a clear declarative response, it chose to . . . hedge [its] bet to see if [it] could get the award and then continue the negotiations after the award was made, and that's not cricket.

[T]o make an award when it is unclear what the rate is . . . is contrary to law.  It's an arbitrary and capricious decision, it's irrational as well to award a contract to an offeror when a material term of the contract, or the solicitation, is still in play.  And the fact that at the time of signing TSI is even raising [the issue] as a point for discussion shows there wasn't a meeting of the minds.

* * *

I do not believe that the argument you are putting forth on behalf of [the Army] is reasonable. . . .  I just don't find it compelling.  Which is not to say I'm trying to shut you down, really, I'm not[.]  I'm just really trying to understand how the Army is making this argument.

* * *

I cannot get past the email exchange between [. . .] and . . . Samuel Bennett.  It seems an absolute departure from reality for anyone to think that there was a meeting of the minds with regard to the material term of the solicitation and, of course, the contract of a capped rate, when the cap is triggered.

I believe that—and I will find . . . if it's necessary for me to rule, that that term was still in play, that TSI did not agree to it, and that was quite clear from [. . .]'s response to Mr. Bennett, and clearly saying "[Mr. Bennett, you have 20 . . . minutes to sign this contract, I need to know."  It wasn't just a passing inquiry—"when you get around to signing it that day or in the next business day, or a month from now—it was "I need to know now because if not, this procurement will be reopened."  I think that's the only legitimate, reasonable interpretation.

* * *

10

> I read those emails, after the contract had been awarded to TSI,
> [and] there was no question in my mind that there was no meeting
> of the minds with respect to that critical piece of the contract.
>
> * * *
>
> I appreciate [the Army's] argument, but I don't embrace it.  I don't
> think it's the better of the two arguments.

Tr. 9-10, 20, 52-55, 68, 75, 77 (alterations to punctuation made for clarity).

Second, the court made clear its view that the Army should take corrective action:

> I would really strongly suggest to the Army that with the additional
> briefing that's going to be required, [that it] stay performance of
> the contract until briefing is completed and I have an opportunity
> to rule . . . . I also would strongly suggest to the Army that they
> think about taking corrective action now to go back, reopen
> discussions, clarify with all offerors what the cap rate is and we
> can avoid the additional briefing and . . . from my perspective, a
> needless ruling.
>
> * * *
>
> I just commend to . . . the Army to mull over those thoughts, . . .
> because I believe that the Dellew Corporation has provided me
> with ample grounds to sustain the protest with respect to the G&A
> cap rate.
>
> * * *
>
> I think [the Army] should [re]open the procurement . . . to make
> sure that . . . the procurement is done properly, and that way we
> will avoid . . . another protest.
>
> * * *
>
> [A] corrective action should be taken in this case . . . just make
> sure it's done right.  And I know I still have to hear from Mr.
> Crusius, [TSI's counsel,] so this is not a good day for Mr. Crusius,
> I'm sure, given what I've said, but I, frankly, I would rather be
> candid with . . . attorneys in argument so . . . you can see where
> I'm going[.]
>
> * * *

> [The fact that TSI continued to try to negotiate the terms of the contract after it was awarded the contract] demonstrates that there is a problem, that it's manifest, and must be corrected.  The Army can do so by taking corrective action now and going back and looking at that aspect of the proposal, and the other area that was identified with regard to [. . .].  [T]his is easily remedied by the Army.
>
> And it may very well come out that . . . in your client's favor by saying, "yes, we agree to the [. . .] percent."  I am not eliminating them from the competition.  I would not eliminate them from the competition.  But discussions have got to be reopened.
>
> * * *
>
> I believe there are more than adequate grounds that Dellew has identified to sustain this protest.  I believe it should go back to the agency.  I hope the agency takes to heart what I said today, and that they reopen the process, get it done right, which they're fully capable of doing, and I know was their original intent.  So, I hope that's what happens, and I don't know how it will shake out, but there's no reason why your client would be excluded from . . . this protest based upon what I've seen, what has been argued both in the briefs and here today.
>
> * * *
>
> [I]t's up to the Army to determine the scope and the breadth of the corrective action in terms of proposals needing to be updated.  I just want them to do what the right thing is.

Id. at 67-70, 77-78, 83, 87 (see parenthetical on page 11).

Third, contrary to defendant's argument, the Army did not voluntarily decide to take corrective action.  It only did so following oral argument and following the government's realization that the court was not swayed by its argument.  At the end of the argument, counsel for the United States stated:

> Your Honor, the agency counsel indicates that it will take approximately a week to get confirmation of whether or not a corrective action can be taken.  That's certainly what I'm going to recommend.  Unfortunately, I can't force the Army to do anything.

Id. at 92.  In addition, in subsequent filings, the government acknowledged that its decision to take corrective action was due in part to the court's statements at oral argument.  See Joint Status Report 2 ("Due to the change in conditions, as well as the discussions held at oral argument on

October 22, 2015, the Army determined to take corrective action."); Def.'s Reply to Mot. to Dismiss 9 ("That the solicitation will be amended to not only clarify the issues raised by the Court at oral argument, but also to address the change in conditions, is in accordance with the FAR and is not unreasonable.").  Thus, unlike in Rice Servs., Ltd., where the Navy decided to take remedial action before the court issued any rulings, in this case, although the court did not issue an opinion, defendant knew that the court intended to rule in plaintiff's favor and took corrective action as a result of that knowledge.

Finally, when the court made its comments, it was late in the process.  The court had already considered the parties' arguments and drafted an opinion concluding that (1) there was no meeting of minds as to a material term of the contract, (2) the Army's award of the contract to TSI was arbitrary and capricious, and (3) the Army should initiate corrective action to remedy the faulty award:

> [I]t's important for me to press the questions I have to see if anything you say to me changes my mind.
>
> * * *
>
> I had a draft decision [wherein I intended to recommend that the Army reopen discussions, rather eliminate TSI] and that's what I intended to do.

Tr. 70, 85.

In sum, the court concludes that there is good cause to extend the holding in Universal Fidelity LP, which dealt with a written order, to the oral comments made in this case.  In both cases:  (1) the matter was fully briefed at the time the statements were made, (2) the court arrived at legal conclusions after considering the merits of the parties' positions, (3) the parties were made aware of those legal conclusions, and (4) defendant took corrective action after having been made aware of the court's position.  In other words, as in Universal Fidelity LP, because defendant understood how the court intended to rule, the court's statements carried a sufficient judicial imprimatur to materially alter the relationship between the parties, giving plaintiff prevailing party status under the EAJA.

**E. The Government's Position Was Not Substantially Justified**

"The Government bears the burden of showing that its position was substantially justified in the underlying litigation." Lion Raisins, Inc. v. United States, 57 Fed. Cl. 505, 512 (2003) (citing Scarborough v. Principi, 319 F.3d 1346, 1354 (Fed. Cir. 2003)).  Under the EAJA, the government's position is defined not only as its position in the civil action, but also as "the action or failure to act by the agency upon which the civil action is based."  28 U.S.C. § 2412(d)(2)(D).  To be substantially justified, the government's position must be "justified to a degree that could satisfy a reasonable person."  Pierce v. Underwood, 487 U.S. 552, 565 (1988) (citations omitted).  Thus, under the EAJA, in order to determine whether the government's position was substantially justified, the court must examine the "entirety of the government's conduct" and determine "whether the government's overall position had a reasonable basis in both law and fact."  Chiu v. United States, 948 F.2d 711, 715 (Fed. Cir. 1991) (footnote omitted).

In this case, defendant argues that the Army's position was substantially justified.  Def.'s Resp. 14-16.  First, defendant claims that its belief that the solicitation did not require TSI to cap its G&A rate was reasonable because the language of the solicitation was permissive rather than mandatory:

> While Dellew argued that this requirement forced TSI to cap its rates, . . . the Government's interpretation of that provision—that the Army was permitted to impose a cap on a significantly lower G&A rate and that an offeror was not required to cap its own rate—was reasonable. . . . The plain language of this provision contains no explicit requirement that an offeror cap its own rates and, therefore, the Government reasonably determined that TSI took no exception to a non-existent requirement.

Id. at 15.  The court disagrees.  Section L.5.4.2.7.5(d) of the solicitation provided that if an offeror's proposal "include[d] indirect rates that are significantly lower than the supporting historic actual or budgetary data provided[,] those rates will be capped for evaluation purposes and any future billing."  Id.  While it is true that the solicitation does not explicitly state that it is the offeror's obligation to cap its own rate, it makes no sense for anyone other than the offeror to cap its own rate given the significance that rate will have on its potential profit under the contract.  As the court noted in its comments during the October 22, 2015 oral argument:

> I think it's a critical piece.  I don't see how there's any wiggle room around it . . . . [W]hen offerors make proposals to the United States, and there are specific rates that impact their price, and we're talking about a G&A cap, who but the offeror should come up with that rate?
>
> [I]f an offeror says, "well, I'm not going to cap my rate," and the Army comes back . . . and says, "well, I'm going to assign you a 9.5, and I'm going to assign this other offeror a 3.2," that would be arbitrary and capricious on the part of the agency.  It seems to me

> that . . . if there's disparity [with] the historical rate and that the
> capping rate is triggered, who but the offeror should be advancing
> the . . . rate?

Tr. 50-51 (see parenthetical on page 11).

Next, defendant claims that its argument regarding the sufficiency of the Army's cost-realism analysis was reasonable because this type of analysis is generally performed for purpose of determining whether a cost estimate is too low, but in this case, the analysis demonstrated that one of the offeror's rates was too high. Def.'s Resp. 15. Although the court noted during the oral argument that it had not reached a conclusion as to the merits of plaintiff's cost realism argument, the court need not address it now given the court's determination that defendant's position as to the G&A rate cap issue was not substantially justified—a position that led to the government's decision to take corrective action. Furthermore, the court notes that common sense dictates that whether or not the government's position is substantially justified with regard to the sufficiency of its analysis has nothing whatsoever to do with the reason why the analysis was conducted.[3]

### F.  No Special Circumstance Exist That Would Render an Award Unjust

There are no special circumstances that would render an award of attorney's fees unjust in this case.

### G.  Plaintiff Is Entitled to an Award of Attorney's Fees

Under the EAJA, "attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A)(ii).

In this case, plaintiff argues that a cost of living adjustment to the EAJA statutory cap should be granted. Pl.'s Mot. 21. Specifically, plaintiff contends that the court should use a

---

[3]  Pursuant to the Code of Federal Regulations, a cost realism analysis is:

> the process of independently reviewing and evaluating specific
> elements of each offeror's proposed cost estimate to determine
> whether the estimated proposed cost elements are realistic for the
> work to be performed; reflect a clear understanding of the
> requirements; and are consistent with the unique methods of
> performance and materials described in the offeror's technical
> proposal.

48 C.F.R. § 15.404–1(d)(1). In order to overturn an agency's cost realism determination, a plaintiff must establish that it lacked a rational basis. Westech Int'l, Inc. v. United States, 79 Fed. Cl. 272, 286 (2007). Thus, an agency must establish that it was rationally based. Id.

"single mid-point inflation adjustment factor applicable to services performed before and after the midpoint," which is "calculated by using the Consumer Price Index ("CPI") of the United States Department of Labor, Bureau of Labor Statistics, in the following formula:  (statutory cap) x ((mid-point CPI) ÷ (baseline CPI))."  Id. at 21-22.  Plaintiff thus concludes that it is entitled to reimbursement at a rate of $190.94 per hour:

> Congress last amended the EAJA in March 1996 to increase the statutory cap for attorneys' fees to $125/hour, thus March 1996 is the proper "baseline CPI" - equaling 155.700. . . .  The "mid-point CPI" for this action is the month that is the mid-point between the first and last month for which attorneys' fees are being awarded. . . . Including the preparation of the Complaint, this civil action lasted 6 months (i.e., July 2015 through December 2015).  The mid-point, therefore, is 3 months, or October 2015 - equaling 237.838.11[.]  Applying the above-referenced calculation formula, the rate for attorneys' fees applicable to this case is determined as follows:  $125.00/hour x (237.838 ÷ 155.700) = $190.94/hour.

Id. at 22.

The government does not counter plaintiff's argument regarding the need to augment the EAJA statutory cap to reflect an increase in the cost of living.  Thus, the court will award attorney's fees at the rate of $190.94 per hour.  The government does, however, contest the amount of time plaintiff claims for four distinct tasks:  (1) preparation of the EAJA fee petition; (2) work performed by attorney Alix Town on August 20, 2015; (3) work performed by Ms. Town on September 2, 2015; and (4) work performed by attorney Shaun C. Kennedy on December 3, 2015.  Def.'s Resp. 16-17.  Each contested entry will be considered in turn.

## 1. Preparation of the EAJA Fee Petition

Plaintiff seeks $11,857.37 in reimbursement for work performed on the fee petition by Mr. Kennedy ("SCK") and Adam K. Laskey ("AKL").  Mr. Laskey is a partner at the firm of Oles Morrison Rinker & Baker LLP ("Oles Morrison").  Pl.'s Mot., Decl. of Adam K. Lasky.  Although it is not clear, the court presumes that Mr. Kennedy is a senior associate at Oles Morrison, since his hourly billing rate is $[. . .], just $15 less than Mr. Lasky's hourly billing rate of $[. . .].  The work, detailed below, was performed from December 28, 2015, to January 28, 2016:

| Date | Attorney | Description | Hours |
|---|---|---|---|
| 12/28/15 | SCK | Conducted legal research for EAJA motion for attorneys' fees and litigation expenses | 1.9 |
| 12/29/15 | SCK | Continued legal research and drafting EAJA motion for attorneys' fees | 5.3 |
| 12/30/15 | SCK | Continued legal research and drafting EAJA motion for attorneys' fees | 4.7 |
| 12/31/15 | SCK | Continued drafting EAJA motion for attorneys' fees | 3.4 |

| 1/6/16 | SCK | Conducted legal research regarding timeliness of EAJA motion; continued drafting same | 2.3 |
|---|---|---|---|
| 1/7/16 | SCK | Conducted legal research regarding size status requirements under the EAJA; conducted legal research regarding "substantially justified" standard; continued drafting EAJA motion | 8.4 |
| 1/8/16 | SCK | Completed drafting EAJA motion for attorneys' fees and litigation expenses | 3.4 |
| 1/11/16 | AKL | Reviewing and revising draft EAJA motion | 4.5 |
| 1/11/16 | SCK | Conferred with client regarding company size; conducted legal research regarding EAJA motion; revised same | 4.7 |
| 1/12/16 | AKL | Legal research on EAJA issues; revising sections of EAJA motion; adding new section to motion; working on declaration in support of motion and compiling cost data to support | 4.5 |
| 1/13/16 | AKL | Editing costs/expenses section of EAJA motion; working on declaration | 1 |
| 1/13/16 | SCK | Drafted affidavits in support of EAJA motion | 1.3 |
| 1/14/16 | AKL | Legal research on required contents of EAJA application; revision motion; drafting declaration and compiling exhibits | 7 |
| 1/15/16 | SCK | Reviewed and revised EAJA motion; conducted legal research regarding recovery of fees from prior protest; conferred on same | 2.3 |
| 1/15/16 | AKL | Revising motions and declarations; scanning exhibits; proofing and cite checking motion | 2.5 |
| 1/16/16 | AKL | Finalizing motion and related docs for filing; preparing TOA and TOC; final edits to all filings; filing motion | 3 |
| 1/28/16 | SCK | Prep for and attend COFC status conference regarding EAJA motion; conferred with AKL regarding same | 0.4 |
| 1/28/16 | AKL | Prep for and attend COFC status conference regarding EAJA motion, conferred with SCK regarding same; preparing and filing first supp. to EAJA application, and supporting declaration; filing the same with the court | 1.5 |
| TOTAL | | | 62.1 |

Id., Ex. B; Pl.'s Suppl. Mot., Second Decl. of Adam K. Lasky.  At the EAJA hourly rate of $190.94, the 62.1 hours of work performed by Mr. Kennedy and Mr. Laskey would result in an award of $11.857.37 for these tasks.

The government argues that although reimbursement for time spent preparing a petition for attorney's fees is permissible, the amount plaintiff claims is excessive.  Def.'s Resp. 16.  According to the government, of the total amount of time spent litigating this case, close to one quarter was spent preparing the fee petition:  "This time seems excessive, especially as this Court previously noted that it found unavailing Dellew's argument that it should rule on the merits of the case so Dellew could later seek attorney fees."  Id. at 16-17.  Plaintiff counters that the

government's allegations are insufficient because the government "fails to identify a single, specific time entry that is excessive, redundant, or otherwise unnecessary." Pl.'s Suppl. Mot. 13.

It is well established that time spent preparing the fee petition is compensable under the EAJA. Schuenemeyer v. United States, 776 F.2d 329, 333 (Fed. Cir. 1985); accord Fritz v. Principi, 264 F.3d 1372, 1377 (Fed. Cir. 2001); Brewer v. Am. Battle Monuments Comm'n, 814 F.2d 1564 (Fed. Cir. 1987). "[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." Hensley v. Eckerhart, 461 U.S. 424, 437 (1983). In addition, the fee petition must "be specific enough for the court to determine whether the hours reported were necessary or duplicative." Impresa Construzioni Geom. v. United States, 93 Fed. Cl. 733, 737 (2010) (citing Hensley, 461 U.S. at 433). Furthermore, it is within the court's discretion to discount "[e]xorbitant, unfounded, or procedurally defective fee applications." Comm'r, INS v. Jean, 496 U.S. 154, 163 (1990). "It remains important, however, for the . . . court to provide a concise but clear explanation of its reasons for the fee award." Hensley, 461 U.S. at 433.

Plaintiff's fee petition consists of two primary filings. The first filing contains the following documents: (1) a twenty-four-page motion, (2) a two-page declaration from Ms. Chandra, (3) a two-page report on plaintiff by independent auditor KMH LLP, (4) thirteen pages of balance sheets and accompanying notes, (5) a two-page "Assets and Liabilities & Equity," (6) a two-page declaration from Mr. Lewis, (7) thirty-two pages of timesheets, (8) a four-page declaration from Mr. Lasky, (9) seven pages of Oles Morrison invoices, (10) a one-page itemization of attorney's fees incurred by plaintiff, (11) a one-page invoice from Capital Process Services, Inc., (12) a one-page chart of the CPI, and (13) a Form 5 application for attorney's fees under the EAJA. See Pl.'s Mot. The second filing contains the following additional documents: (1) a two-page supplement to plaintiff's motion, and (2) a three-page supplemental declaration from Mr. Lasky. See Pl.'s Suppl. Mot. Not only is plaintiff's petition sufficiently detailed in that plaintiff provides a description of the task performed by each attorney working on the motion as well as the time spent on each task, but the petition is also sufficiently documented, as evidenced by the various attachments included with the petition. Thus, the only remaining issue is whether the time, and therefore amount claimed, is excessive. In this case, the court concludes that it is not.

Plaintiff seeks reimbursement for 62.1 hours of work on a fee petition that was composed of a twenty-four-page motion, a two-page supplemental motion, and accompanying documentation. In assessing the reasonableness of the hours claimed, it is helpful to group the entries in plaintiff's petition into two categories: (1) entries detailing time spent by counsel solely performing legal research and writing, and (2) entries detailing time spent by counsel on multiple activities, to include conferring with their client, compiling data, preparing declarations, preparing for and participating in a status conference, and performing legal research and writing. The first category consists of the following entries:

| Date | Attorney | Description | Hours |
|------|----------|-------------|-------|
| 12/28/15 | SCK | Conducted legal research for EAJA motion for attorneys' fees and litigation expenses | 1.9 |

| 12/29/15 | SCK | Continued legal research and drafting EAJA motion for attorneys' fees | 5.3 |
| 12/30/15 | SCK | Continued legal research and drafting EAJA motion for attorneys' fees | 4.7 |
| 12/31/15 | SCK | Continued drafting EAJA motion for attorneys' fees | 3.4 |
| 1/6/16 | SCK | Conducted legal research regarding timeliness of EAJA motion; continued drafting same | 2.3 |
| 1/7/16 | SCK | Conducted legal research regarding size status requirements under the EAJA; conducted legal research regarding "substantially justified" standard; continued drafting EAJA motion | 8.4 |
| 1/8/16 | SCK | Completed drafting EAJA motion for attorneys' fees and litigation expenses | 3.4 |
| 1/11/16 | AKL | Reviewing and revising draft EAJA motion | 4.5 |
| 1/15/16 | SCK | Reviewed and revised EAJA motion; conducted legal research regarding recovery of fees from prior protest; conferred on same | 2.3 |
| TOTAL | | | 36.2 |

Thus, counsel spent, at a minimum, 36.2 hours or approximately 4.5 eight-hour days researching and drafting the EAJA motion. The court does not find this to be an excessive amount of time. As plaintiff notes, the government indicated that it would oppose any EAJA motion, thus prompting "Dellew's counsel [to undertake] a thorough effort to research relevant decisional law interpreting all elements necessary to establish entitlement under EAJA." Pl.'s Reply 14. In addition, although only two of the statute's five requirements were contested—that plaintiff was a prevailing party and that the government's position was not substantially justified—as evidenced by the court's analysis above, the issue of plaintiff's status as a prevailing party, given the unique circumstances in this case, is not a settled area of the law. Thus, the time spent by plaintiff researching and drafting this motion is justified.

The second category consists of the remaining entries:

| Date | Attorney | Description | Hours |
| --- | --- | --- | --- |
| 1/11/16 | SCK | Conferred with client regarding company size; conducted legal research regarding EAJA motion; revised same | 4.7 |
| 1/12/16 | AKL | Legal research on EAJA issues; revising sections of EAJA motion; adding new section to motion; working on declaration in support of motion and compiling cost data to support | 4.5 |
| 1/13/16 | AKL | Editing costs/expenses section of EAJA motion; working on declaration | 1 |
| 1/13/16 | SCK | Drafted affidavits in support of EAJA motion | 1.3 |
| 1/14/16 | AKL | Legal research on required contents of EAJA application; revision motion; drafting declaration and compiling exhibits | 7 |
| 1/15/16 | AKL | Revising motions and declarations; scanning exhibits; proofing and cite checking motion | 2.5 |

| 1/16/16 | AKL | Finalizing motion and related docs for filing; preparing TOA and TOC; final edits to all filings; filing motion | 3 |
|---------|-----|------------------------------------------------------------------------------------------------------------|---|
| 1/28/16 | SCK | Prep for and attend COFC status conference regarding EAJA motion; conferred with AKL regarding same | 0.4 |
| 1/28/16 | AKL | Prep for and attend COFC status conference regarding EAJA motion, conferred with SCK regarding same; preparing and filing first supp. to EAJA application, and supporting declaration; filing the same with the court | 1.5 |
| TOTAL | | | 25.9 |

Thus, counsel spent an additional 25.9 hours or approximately 3.2 eight-hour days compiling and in some cases drafting the documents that would be attached to the EAJA motion. Again, the court does not find this to be an excessive amount of time for the tasks described, which in certain instances also included additional time spent researching and drafting the fee application.

### 2. Work by Alix Town on September 2, 2015

Dellew seeks reimbursement for the following work by Ms. Town ("AKT"):

| Date | Attorney | Description | Hours |
|------|----------|-------------|-------|
| 9/2/15 | AKT | Drafting and editing bid protest for COFC | 6.1[4] |

Pl.'s Mot., Decl. of Adam K. Lasky, Ex. A (footnote added).  The government argues that the entry is unclear because it seeks reimbursement for work performed "over a month after Dellew filed its bid protest."  Def.'s Resp. 17.  In other words, the government claims that "it is unclear if Ms. Town refers to drafting and editing Dellew's motion for judgement on the administrative record or to something else."  Id.  The government also notes than plaintiff wrote off an identical entry for work performed by Ms. Town on September 1, 2015.  Id.  In response, plaintiff cites Ms. Town's declaration and clarifies that the billing entry "consisted of time spent by Ms. Town drafting and editing Dellew's [motion for judgment on the administrative record]."  Pl.'s Reply 15.  Thus, the entry is reasonable.

---

[4] Both parties refer to a billing entry for 6.8 hours of work, see Def.'s Resp. 17; Pl.'s Reply 15, but the document they reference, cited as Dkt. No. 57-3 at 9, shows a billing entry for 6.1 hours of work on September 2, 2015.

### 3. Work by Ms. Town on September 2, 2015 and Work by Mr. Kennedy on December 3, 2015

The government contests the reasonableness of two entries—one for work performed by Ms. Town on September 2, 2015, and one for work performed by Mr. Kennedy on December 3, 2015. Def.'s Resp. 17. In its reply, plaintiff "withdr[ew] both of these time entries from its EAJA claim." Pl.'s Reply 15. Thus, plaintiff's award will be reduced accordingly.

### 4. Summary of Attorney's Fees and Expenses to Be Awarded

The court will award plaintiff the following attorney's fees and expenses, pursuant to the EAJA: [5]

| Attorneys' Fees | | | |
|---|---|---|---|
| | Hours | Rate | Total |
| Adam K. Lasky | 278 | $190.94 | $53,081.32 |
| Shaun C. Kennedy | 88.6 | $190.94 | $16,917.28 |
| Alix K. Town | 39.5 | $170.00 | $6,715.00 |
| | | SUBTOTAL | $76,713.60[6] |
| Expenses | | | |
| Mailing of Overnight FedEx of Original Pleadings for Filing with the Court | | | $63.14 |
| Fees Associated with Filing and Service of Original and Copies of Pleadings for Filing with the Court | | | $600.00 |
| Court Filing Fee Advanced by Process Service | | | $400.00 |
| Travel Expenses for Adam Lasky to Attend Oct. 22, 2015 [Oral Argument] | | | $922.82 |
| Printing and Copying of Portions of the Administrative Record | | | $456.30 |
| Ordering of Certified Transcript of Oct. 22, 2015 [Oral Argument] | | | $300.90 |
| | | SUBTOTAL | $2,743.16 |
| | | TOTAL | $79,456.76 |

---

[5] Pursuant to RCFC 54(d)(1), "[c]osts—other than attorney's fees—should be allowed to the prevailing party to the extent permitted by law. See 28 U.S.C. § 2412(a)." Under the EAJA, such taxable costs include photocopying, delivery services, travel, filing fees, and transcripts, if they are reasonable and necessarily obtained for use in the case. See Metro. Van & Storage, Inc. v. United States, 101 Fed. Cl. 173, 201-03 (2011). Here, the government does not contest reimbursement of any of the expenses sought by plaintiff and the court finds that they are reasonable and necessarily obtained by plaintiff for use in the case.

[6] Plaintiff calculates the amount of reimbursement due for attorney's fees as $76,713.58, two cents less than the figure derived by the court. See Pl.'s Reply 16. The discrepancy is most likely due to different rounding practices. In any event, the court will award the higher amount.

### III.  CONCLUSION

Plaintiff is awarded attorney's fees in the amount of $76,713.60 for the original litigation and for the preparation of the fee petition pursuant to the EAJA, plus expenses in the amount of $2,743.16, for a total of $79,456.76.  The clerk of the court shall enter judgment accordingly.

The court has filed this ruling under seal.  The parties shall confer to determine agreed-to proposed redactions.  Then, by no later than Friday, May 20, 2016, the parties shall file a joint status report indicating their agreement with the proposed redactions, attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge